Rel: June 27, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of Southern Reporter. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in Southern Reporter.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2024-2025

_____

### SC-2024-0804

_____

**Ex parte B.T. Roberts, in his capacity as a member of the Auburn University Board of Trustees, et al.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Patti H. Northcutt and Walter M. Northcutt**

**v.**

**B.T. Roberts, in his capacity as a member of the Auburn University Board of Trustees, et al.)**

**(Lee Circuit Court, CV-22-900114)**

WISE, Justice.

The petitioners consist of the members of the Auburn University

Board of Trustees ("the Board") and various employees of Auburn

University ("Auburn"), who are the defendants named in the complaint filed by Patti Northcutt and her husband, Walter Northcutt. The Board defendants consist of B.T. Roberts, Clark Sahlie, James W. Rane, Bob Dumas, Jimmy Sanford, Caroline Aderholt, Zeke Smith, Elizabeth Huntley, Sarah B. Newton, Michael A. DeMaioribus, James Pratt, Wayne T. Smith, Walt Woltosz,[1] Charles D. McCrary, Quentin Riggins, and Timothy Vines, who are members of the Board, and Kay Ivey, the president of the Board and the Governor of the State of Alabama. The employee defendants consist of Jay Gogue, Christopher Roberts, Yee Ming Lee, Jennifer Kerpelman, Imran Rahman, George Flowers, Martin O'Neill, Jaime Hammer, Linda Maxwell-Evans, and Karla McCormick. The defendants petition this Court for a writ of mandamus directing the Lee Circuit Court to grant their motion to dismiss Counts 3 through 8 of the third amended complaint filed by the Northcutts, on the grounds of federal qualified immunity and State immunity pursuant to Art. I, § 14, of the Alabama Constitution, "to the extent [the Northcutts] seek

---

[1]According to the petitioners, Woltosz "now holds the Board seat formerly held by Raymond J. Harbert, and Woltosz in is official capacity is automatically substituted. Ala. R. Civ P. 25(d)." Petition, p. 9.

retrospective equitable relief and/or money damages." Petition, p. 37. We grant the petition in part, deny the petition in part, and issue the writ.

Facts and Procedural History

On March 29, 2022, the Northcutts sued the defendants in the Lee Circuit Court, and they subsequently amended their complaint. On March 22, 2023, the Northcutts filed their third amended complaint. In that complaint, they alleged:

"42. Plaintiff Patti Northcutt previously worked in the College of Human Sciences at Auburn University.

"43. Plaintiff Patti Northcutt previously filed an internal grievance and civil lawsuits against the Auburn University Board of Trustees and various Auburn University employees alleging poor workplace conditions, including but not limited to violations of the FMLA, that were settled through then Auburn University Executive Vice President Don Large.

"44. Plaintiff Patti Northcutt agreed to release her claims and leave her position in the Auburn University College of Human Sciences.

"45. In exchange for her promises, she was paid a sum of money and the settlements mandated that Plaintiff Patti Northcutt's personnel file maintained would not have any mention of adverse action so as to not negatively affect her applying for employment in the future at Auburn University, and that after the settlement of lawsuits, there would not be interference by various Auburn University employees with her finishing her doctoral degree."

3

In the third amended complaint, the Northcutts further alleged that a contract existed between Patti, as a student, and Auburn ("the student/university contract"). Specifically, they asserted:

"51. When a student enrolls at a university, a contract arises that if the student complies with the terms prescribed by the university and completes the required courses, the university must award the student a degree. Implied in this contract is that the university must act in good faith in dealing with the student. A degree may not be refused arbitrarily or capriciously. Actions are arbitrary or capricious if the university failed to adhere to its own publish[ed] rules and guidelines.

"52. Thus, when Plaintiff Patti Northcutt was accepted into her doctoral program, she entered into a contract requiring her to comply with the terms prescribed by the university and complete the required courses. If she did these things, she must be awarded her degree. Good faith in dealing with … her was required, and in regard to her treatment as a student, the policies and procedure of the institution must be followed."

With regard to Patti's doctoral program, the Northcutts alleged that Martin O'Neill was the "Department Head of Human Sciences" and that he was Patti's original major professor. They further alleged that O'Neill had forced Patti "to change her dissertation topic because he wanted to use the topic himself" even though Patti "had been working on her dissertation topic for years at that point"; that, subsequently, and

4

"without explanation," O'Neill told Patti he was withdrawing as her major professor; that Patti was told that "she had to find a new major professor on her own"; and that this forced Patti "to start her dissertation over again, causing added expenses by prolonging the time to complete her program; costing her the loss of years of research; and causing mental anguish, distress, and frustration."

The Northcutts alleged that Yee Ming Lee subsequently agreed to be Patti's major professor and that Patti's doctoral committee consisted of Lee, Jennifer Kerpelman, Imran Rahman, and Maria Kraska. They further alleged that Jaime Hammer, who was the general legal counsel for Auburn, "worked with Defendants Lee and/or Kerpelman to set academic standards and/or requirements regarding [Patti's] doctoral program"; that Patti's doctoral committee had "discussed with the legal department manners and/or methods that should be dealt with in the pursuit of her doctoral degree including, but not limited to, papers, projects and classes she should be made to take"; that Hammer had "told Defendant Lee that the committee members should never speak to [Patti] alone stating 'none of the committee should meet with her without at least two of you present so that there is always a witness'"; that Lee had

sent an email containing those instructions to Patti's committee members; and that one of Patti's committee members had forwarded that email to Patti. They further alleged that Lee and Kerpelman had worked with Hammer "to come up with more stringent requirements for [Patti] to complete than any other doctoral students" and that George Flowers, the dean of the Auburn graduate school, had "allowed the Auburn University legal department and/or general counsel, Defendant Hammer, to be involved with approving [Patti's] committee to assign her extra work not required of any other doctoral students."

With regard to Patti's doctoral committee, the Northcutts alleged:

"In a phone conversation, Defendant Lee and Defendant Kerpelman told Dr. Kraska to resign from [Patti's] committee and refused to give Kraska the reason why they wanted her to resign. When Kraska refused to withdraw from [Patti's] committee, Defendant Kerpelman asked Kraska to hang up so she and Defendant Lee could continue to discuss [Patti] without Kraska being involved. Kraska refused, and Defendant Kerpelman instructed Defendant Lee to hang up and they would discuss [Patti] together at another time when Kraska was not on the phone."

They further alleged:

"a. Defendant Kerpelman instructed Defendant Lee that she, as [Patti's] major professor, had to fail her out of the doctoral program because she had been a problem to Auburn before because she had sued the University.

6

"b.    Defendant Lee became visibly upset and indicated to the committee that she did not know what to do regarding the pressure Defendant Kerpelman was placing on her to fail [Patti].

"c.    Defendant Lee expressed to the committee that she was worried about getting her tenure because this was her first major professor role for a doctoral student so she wanted to handle it right.  Defendant Kerpelman assured Defendant Lee that if she failed [Patti] out of the doctoral program, she would get tenure.

"d.    Defendant Lee was more worried about Defendant Kerpelman helping her get tenured than she was about treating [Patti] fairly and equitably.  She failed to judge [Patti] strictly upon her performance in her doctoral requirements.

"e.    Defendant Lee informed [Patti] that she had failed out of the doctoral program after Defendant Kerpelman told her to in exchange for Kerpelman agreeing to help Lee obtain tenure.

"f.    Defendants Lee and Kerpelman then asked [Patti] to go pick up the forms that were needed to request a defense of her dissertation and also the form Defendant Lee needed to fail [Patti] from the doctoral program. Defendants Lee and Kerpelman asked Plaintiff Patti Northcutt if she would request the forms, pick them up, backdate them, and sign them.  [Patti] refused to do these things."

The Northcutts further alleged:

"83.    Defendants Lee and Kerpelman attempted to hold a meeting that would be [Patti's] dissertation defense and that would be the time they would fail her out of the doctoral program.

7

"84. However, when Defendant Lee called the meeting, she failed to follow the proper University policies and procedures to hold such a meeting. A professor cannot call for the student to defend their dissertation. The student has to fill out a form from the graduate school requesting the defense of her dissertation. That was one of the forms that Defendants Lee and Kerpelman tried to get [Patti] to request from the graduate school, pick up, and backdate.

"85. Committee member Kraska had gotten angry about the way Defendants Lee, Kerpelman, and Rahman were handling the meeting, so she left while the other committee members continued to try to convince [Patti] to go get the forms.

"86. At that point [Walter] was standing in the hall and Kraska told him that what the other committee members were doing [to] [Patti] was wrong and it was against protocol for them to continue to meet with Patti and make any decisions without Kraska present."

The Northcutts further asserted that Patti had not been given notice "that the meeting was going to be her dissertation defense"; that "[s]he was required to be given 14 days' notice"; and that Lee had told Patti that "the sole purpose of the meeting was to answer a question Defendant Kerpelman had concerning [Patti's] thesis and nothing more."

The Northcutts alleged that, at some point, Lee, Kerpelman, and Rahman withdrew from her doctoral committee, which effectively prevented her from completing her doctoral program. The Northcutts

further alleged that it was Flowers's "duty ... to assist doctoral candidates by providing them the necessary professors and committee members to complete their doctoral degree"; that Flowers had told Patti that "she would have to find replacements for her committee or 'just not graduate'"; and that Flowers "both failed to and refused to attempt to aid [Patti] in getting a new committee and/or a new major professor, as he was required to do as per the bulletin." They also alleged:

"144. According to the Auburn University policy, a major professor, as well as committee members, must come from within the doctoral students' department, and if they not [sic] from that department, then the individual has to be approved by all members of the department.

"145. No other members of the College of Human Sciences, out of fear of losing their jobs, would commit to serve as [Patti's] major professor or be on her committee.

"146. [Patti] found a Ph.D. that was willing to be her major professor, but that individual was from Extension (which is closely aligned with the College [of] Human Sciences).

"147. Defendant Flowers would not allow [Patti] to use the individual from Extension as her major professor. He did this knowing she could not find anyone in the College of Human Sciences. Therefore, [Patti] was effectively prevented from being able to complete her doctoral program."

9

The Northcutts also alleged that Patti did not receive consideration for employment opportunities for which she was qualified. They alleged that Christopher Roberts was the former dean of the School of Engineering and is the current president of Auburn. The Northcutts alleged that Patti had applied for a position in the College of Engineering; that Patti had held the same position in another college at Auburn; that Patti "held more than enough of the requirements for the job opening"; that Patti did not get an interview for that position; that "to the best of [Patti's] knowledge and/or beliefs, no other applicant got an interview"; that that position was filled by the person who had previously worked as the executive support assistant for Roberts; and that, "to the best of [Patti's] knowledge, that person did not meet all the requirements for the position that were posted." The Northcutts further alleged that neither Patti nor any other qualified applicant was given a chance to compete for that position, which "was in direct violation of the Auburn University hiring policies and procedures." They went on to allege that Roberts "knew or reasonably should have known that [by] not following the proper procedures of considering multiple candidates and interviewing

10

qualified candidates who had applied, he was violating Auburn University hiring policies/procedures."

The Northcutts further alleged that Linda Maxwell-Evans was "the Executive Director of Campus Relations for Human Resources at Auburn University" and had acted on behalf of the Human Resources Department in the previous civil actions that Patti had commenced, which had been resolved through settlement agreements. They further alleged:

"191. In the Settlement Agreements, [Patti] was supposed to be allowed equal opportunities to apply for jobs at Auburn University after a four-year period. Also agreed upon was [Patti's] personnel file maintained would not have any mention of adverse action so as to not negatively affect her applying for employment in the future at Auburn University.

"192. Due to her role in the discussion for the Settlement Agreements, Defendant Maxwell-Evans knew or should have reasonably known of Plaintiff Patti Northcutt's right to be considered for employment at Auburn University after the four-year period and that nothing was to be said negatively about her and no negative information was to be placed in her personal records."

The Northcutts alleged that Karla McCormick was the associate vice president for Human Resources at Auburn; that, even though McCormick had not been directly involved in the discussions regarding the

11

settlement agreements, she had access to them; and that McCormick "knew or should have reasonably known of [Patti's] right to be considered for employment at Auburn University after the four-year period and that nothing was to be said negatively about her and no negative information was to be placed in her personal records." With regard to Maxwell-Evans and McCormick, the Northcutts alleged that, after the four-year period had expired, Patti had applied for numerous positions at Auburn and had "not received consideration for any of those positions, despite the fact she met or exceeded the requirements for all positions she applied for." They also alleged that "[a] member of the Auburn University Human Resources Department tried to help [Patti] apply for jobs at the university that she qualified for"; that all communication between Patti and that employee cut off "suddenly and without warning"; and that that "employee would no longer return her calls or emails, which he previously always did."

With regard to the Board defendants, the Northcutts alleged that Patti had "contacted and met with Board of Trustee Defendants [Bob] Dumas and [Elizabeth] Huntley about issues relating to breaches of both the Settlement Agreements and the student/university contract. Both of

them said that they would inquire into what was going on, but nothing else was ever done."

The Northcutts alleged that Jay Gogue was president of Auburn when the events described in the complaint took place. They also alleged that Patti had contacted Gogue about alleged breaches of the settlement agreements and alleged breaches of the student/university contract. They further alleged

> "68. Defendant Gogue did not instruct the employees, agents and/or assigns of Auburn University to comply with the terms of the Settlement Agreements.
>
> "....
>
> "74. Defendant Gogue did not instruct the employees, agents and/or assigns of Auburn University to comply with Auburn University rules, regulations and requirements regarding the contract between the university and Plaintiff Patti Northcutt as a student as he was required to do. He knew that the student/university contract was not being followed by the failure of university policies and procedures to be applied in Plaintiff Patti Northcutt's case. His position required him to act to uphold the integrity of the institution, yet he failed to do so. "

The Northcutts also alleged that Hammer had monitored Patti's private emails sent through Auburn's email system and that he had done so at Gogue's instruction.

The Northcutts alleged that the defendants had "acted in retaliation" for Patti's previous lawsuits. In Count 1 of the third amended complaint, the Northcutts asserted that the defendants had "retaliated against [Patti] because she took steps to enforce her lawful rights under" the Family Medical Leave Act of 1983, 29 U.S.C. § 2601 et seq. ("the FMLA"). The Northcutts brought Counts 2 through 4 of the third amended complaint pursuant to 42 U.S.C. § 1983. In Count 2 of the third amended complaint, the Northcutts asserted that the defendants had "retaliated against [Patti] because [she] took steps to enforce her lawful rights under the First Amendment's freedom of expression." In Count 3 of the third amended complaint, the Northcutts asserted that Patti's "rights under the equal protection clause were violated by the Board Defendants and Defendants Gogue, Lee, Kerpelman, Flowers, Hammer, Roberts, Maxwell-Evans, and McCormick." In Count 4 of the complaint, the Northcutts asserted that Patti's "procedural due process rights were violated by the Board Defendants and Defendants Gogue, Lee, Kerpelman, Rahman, and Flowers."

Counts 5 through 9 of the third amended complaint asserted various state-law claims. In Count 5, the Northcutts asserted that the

14

Board defendants, Gogue, Lee, Kerpelman, Rahman, Flowers, Hammer, Roberts, Maxwell-Evans, and McCormick had breached the terms of the settlement agreements. In Count 6, the Northcutts asserted that the Board defendants, Gogue, Lee, Kerpelman, Rahman, Flowers, Hammer, Roberts, Maxwell-Evans, and McCormick had intentionally interfered with the settlement agreements. In Count 7, the Northcutts asserted that the Board defendants, Gogue, Lee, Kerpelman, Rahman, Flowers, O'Neill, and Hammer had breached the student/university contract. In Count 8, the Northcutts asserted that the Board defendants, Gogue, Lee, Kerpelman, Rahman, Flowers, O'Neill, and Hammer had intentionally interfered with the student/university contract. In Count 9, the Northcutts asserted a claim of intentional infliction of emotional distress against Lee, Kerpelman, Rahman, O'Neill, and Hammer.[2]

The Northcutts stated:

"47. All Defendants are being sued in their official capacities to the extent that the Plaintiffs are seeking injunctive relief.

---

[2]Intentional infliction of emotional distress "is often referred to in our cases as a tort-of-outrage claim. See Wilson v. University of Alabama Health Servs. Found., P.C., 266 So. 3d 674, 675 n. 1 (Ala. 2017)." Deaton v. South Highland Child Dev. Ctr., Inc., 405 So. 3d 244, 255 (Ala. 2024).

"48. Employee Defendants (all Defendants, except the Board of Trustee Defendants) are being sued in their individual capacities for monetary damages.

"49. In the conduct complained of, the Employee Defendants, in their individual capacities, were all either acting beyond the scope of their official responsibilities; acting with malicious purpose, bad faith, or in a wanton or reckless manner; and/or their conduct violated clearly established law rights that a reasonable person would have known in the performance of their duties."

The Northcutts sought the following equitable relief:

"A. Direct the appropriate party(s) to confer on Plaintiff Patti Northcutt the Ph.D. degree which she dutifully earned and accomplished but for the malfeasance of the Defendants.

"B. Direct the Auburn University Board of Trustees to implement a procedural policy in which an aggrieved student in the same or similar circumstance as Plaintiff Patti Northcutt can easily and in a straightforward fashion appeal the decision and/or seek a redress for their aggrieved wrongs.

"C. Direct the Auburn University Board of Trustees to order the appropriate person(s) to publicly censure the named Defendants for the intentional wrongs committed against Plaintiff Patti Northcutt. Such an action would have a chilling effect on such wrongs from being committed in the future by these or any other employees.

"D. Plaintiff requests attorney fees mandated by the terms of the Settlement Agreements and consistent with 42 U.S.C. § 1983 and the cases thereunder in the Eleventh

16

Circuit as related to the requested injunctive relief in this count.

"E.   Other equitable relief as the Court sees fit."

With regard to monetary relief and damages, the Northcutts sought:

"F.   Costs and expenditures made by Plaintiff Patti Northcutt in pursuance of her doctoral degree from Auburn University;

"G.   Damages relating to Plaintiff Patti Northcutt's emotional distress;

"H.   Damages relating to Plaintiff Walter Northcutt's loss of consortium;

"I.   Punitive damages to deter similar conduct in the future;

"J.   Attorneys' fees as mandated by the terms of the Settlement Agreements, under the FMLA, [and] 42 U.S.C. § 1983; and

"K.   Other monetary relief as the Court sees fit."

The defendants filed a motion to dismiss Counts 2 through 9 of the third amended complaint on various grounds. The defendants asserted that Counts 2 through 4 were due to be dismissed because they were entitled to federal qualified immunity as to those claims. With regard to the allegations in Count 5 of the complaint that the Board defendants had breached the settlement agreements, the defendants asserted that

17

that claim was barred by State immunity pursuant to Art. I, § 14, of the Alabama Constitution. They further asserted:

> "The breach of contract claim based on the settlement agreement is due to be dismissed against Employee Defendants Gogue, Lee, Kerpelman, Rahman, Flowers, Hammer, Roberts, Maxwell-Evans, and McCormick because none of them is or ever was a party to any settlement agreement with Northcutt. These Defendants, in their personal, individual capacities cannot be liable in damages for breaching a contract to which they are not a party. See Childs v. Pommer, 348 So. 3d 379, 387-88 (Ala. 2021). Likewise, they cannot be liable in their 'official' capacities for injunctive relief or specific performance for the same reason that the Board Defendants cannot be liable as explained above."

With regard to Count 6, alleging intentional interference with the settlement agreements, the defendants asserted that the Board defendants were entitled to State immunity as to that claim. They further asserted that Count 6 was due to be dismissed because "[a]ll of the Defendants sued on this claim -- the Board Defendants as well as the Employee Defendants -- are either officers, agents or employees of Auburn and thus are not 'strangers' to the settlement agreement."

With regard to Count 7, alleging breach of the student/university contract, the defendants argued:

> "If any 'Student-University' contract such as the one described by Northcutt existed, it was by definition between Northcutt and Auburn. None of the Employee Defendants

18

named in this breach of contract claim was a party to any such contract, and thus cannot be individually liable in damages for any breach. See Childs [v. Pommer], 348 So. 3d [379,] 387-88 [(Ala. 2021)]."

They further argued that, to the extent this claim was brought against the Board defendants and the employee defendants in their official capacities,

"it is a claim against Auburn itself and likewise due to be dismissed under § 14. See Ala. A&M Univ. v. Jones, 895 So. 2d [867,] 873 [(Ala. 2004)]. As discussed above regarding Count 5, the law is clear that a plaintiff cannot evade § 14 immunity by suing officers or employees in their official capacities when, as here, the claim is in effect against the State -- in this instance Auburn University. If the plaintiff seeks relief that would 'directly affect a contract or property right of the State,' the claim is against the State and is barred by § 14. See, e.g., Ex parte Moulton, 116 So. 3d [1119,] 1131 [(Ala. 2013)]. Here Northcutt seeks contract-based damages, specific performance of the supposed Student-University contract in the form of being awarded her degree, injunctive relief relating to the contract, attorney's fees, and other relief. … All the requested relief would affect Auburn's 'contract rights' and thus this claim is, in effect, a claim against Auburn that is barred by sovereign immunity."

With regard to Count 8, alleging intentional interference with the student/university contract, the defendants initially argued that "an intentional interference with contract claim presupposes the existence of an enforceable contract, and the Student-University contract is not enforceable against Auburn because of sovereign immunity, as explained

19

above in the section discussing Count 7." The defendants further asserted that none of them were strangers "to the Student-University contract because each of them is an officer, agent, or employee of Auburn."

The Northcutts filed a brief in opposition to the motion to dismiss, and the defendants filed a reply brief in support of the motion to dismiss.

On October 21, 2024, the trial court entered an order in which it granted the defendants' motion to dismiss the First Amendment claim in Count 2 and the intentional-infliction-of-emotional-distress claim in Count 9 of the third amended complaint. However, it denied the defendants' motion to dismiss as to Counts 3 through 8 of the third amended complaint. This petition followed.

## Standard of Review

"In Ex parte Branch, 980 So. 2d 981 (Ala. 2007), this Court stated:

"'The denial of a motion for a summary judgment or of a motion to dismiss grounded on immunity is reviewable by a petition for a writ of mandamus. Ex parte Rizk, 791 So. 2d 911, 912 (Ala. 2000). Ex parte Haralson, 853 So. 2d 928, 931 n.2 (Ala. 2003) ("The denial of a motion to dismiss or a motion for a summary judgment generally is not reviewable by a petition for writ of mandamus, subject to certain narrow exceptions,

20

such as the issue of immunity. Ex parte Liberty Nat'l Life Ins. Co., 825 So. 2d 758, 761-62 (Ala. 2002)."). This Court has stated:

> """A writ of mandamus is an extraordinary remedy available only when there is: '(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.' Ex parte BOC Group, Inc., 823 So. 2d 1270, 1272 (Ala. 2001)."

> "'Ex parte Nall, 879 So. 2d 541, 543 (Ala. 2003).'

"980 So. 2d at 984.

> "'In reviewing the denial of a motion to dismiss by means of a mandamus petition, we do not change our standard of review. [Ex parte Butts, 775 So. 2d 173, 176 (Ala. 2000)]; see also [Ex parte] Wood, 852 So. 2d [705,] 709 [(Ala. 2002)] (review of a denial of a summary-judgment motion grounded on a claim of immunity by means of a petition for a writ of mandamus does not change the applicable standard of review). Under Rule 12(b)(6), Ala. R. Civ. P., a motion to dismiss is proper when it is clear that the plaintiff cannot prove any set of circumstances upon which relief can be granted. Cook v. Lloyd Noland Found., Inc., 825 So. 2d 83, 89 (Ala. 2001). "'In making this determination, this Court does not consider whether the plaintiff will ultimately prevail, but only whether [she] may possibly prevail.'" Id. (quoting Nance v. Matthews, 622 So. 2d 297, 299

21

(Ala. 1993) ). We construe all doubts regarding the sufficiency of the complaint in favor of the plaintiff. <u>Butts</u>, 775 So. 2d at 177.'

"<u>Ex parte Haralson</u>, 853 So. 2d 928, 931 (Ala. 2003)."

<u>Ex parte Wilcox Cnty. Bd. of Educ.</u>, 285 So. 3d 765, 773 (Ala. 2019).

<u>Discussion</u>

The defendants argue that this Court should "grant the Petition, issue the writ, and direct the Circuit Court of Lee County to dismiss counts 3 through 8 against [the defendants] to the extent they seek retrospective equitable relief and/or money damages." Petition, p. 37. Specifically, they contend that they are entitled to qualified immunity as to the federal claims against them and to State immunity pursuant to § 14, Alabama Const. 2022, as to the state-law claims against them. In the third amended complaint, the Northcutts stated, "[a]ll Defendants are being sued in their official capacities to the extent that the Plaintiffs are seeking injunctive relief." They further stated, "Employee Defendants (all Defendants, <u>except the Board of Trustee Defendants</u>) are being sued in their individual capacities for monetary damages." (Emphasis added.)

I. <u>Federal-Law Claims</u>

22

In Counts 3 and 4 of the third amended complaint, the Northcutts asserted equal-protection and due-process claims against the defendants.

A. Claims for Injunctive Relief Against the Defendants in their Official Capacities

In the third amended complaint, the Northcutts stated that all the defendants were "being sued in their official  capacities to the extent that the Plaintiffs are seeking injunctive relief."  In their petition, the defendants argue that, to the extent that the Northcutts sought retrospective equitable relief, those claims are barred by the doctrine of federal qualified immunity.  With regard to the equal-protection and due-process claims against the Board defendants, the defendants argue that "[p]rospective injunctive relief is not the subject of this Petition, although there is no merit to the claim."  Reply brief, p. 5.[3]

In the third amended complaint, the Northcutts requested the following equitable relief:

_____

[3]The defendants also assert that "[p]rospective injunctive relief is not available against [the employee defendants] in their individual capacity."  Reply brief, p. 5.  However, to the extent that they were seeking injunctive relief, the Northcutts sued the defendants only in their official capacities.  The defendants do not argue that the employee defendants could not be sued for prospective injunctive relief in their official capacities.

"A.    Direct the appropriate party(s) to confer on Plaintiff Patti Northcutt the Ph.D. degree which she dutifully earned and accomplished but for the malfeasance of the Defendants.

"B.    Direct the Auburn University Board of Trustees to implement a procedural policy in which an aggrieved student in the same or similar circumstance as Plaintiff Patti Northcutt can easily and in a straightforward fashion appeal the decision and/or seek a redress for their aggrieved wrongs.

"C.    Direct the Auburn University Board of Trustees to order the appropriate person(s) to publicly censure the named Defendants for the intentional wrongs committed against Plaintiff Patti Northcutt. Such an action would have a chilling effect on such wrongs from being committed in the future by these or any other employees.

"D.    Plaintiff requests attorney fees mandated by the terms of the Settlement Agreements and consistent with 42 U.S.C. § 1983 and the cases thereunder in the Eleventh Circuit as related to the requested injunctive relief in this count.

"E.    Other equitable relief as the Court sees fit."

Thus, it appears that the only specific equitable relief the Northcutts requested in the third amended complaint was prospective injunctive relief. In fact, in their brief in opposition to the motion to dismiss, the Northcutts stated that they are "seeking prospective injunctive relief for [the] federal law claims against the Defendants in their official capacities

in order to prevent future violation of [Patti's] federal constitutional rights." The defendants have not presented any argument or authority to establish that the Northcutts actually requested any retrospective injunctive relief. Thus, we need not determine whether the defendants would be entitled to qualified immunity as to any claims seeking retrospective injunctive relief.

In this section of the complaint, the Northcutts also requested attorneys' fees arising out of their claims for injunctive relief.

> "[42 U.S.C. §] 1988 authorizes an award of attorney fees, 'payable by the States when their officials are sued in their official capacities,' Hutto v. Finney, 437 U.S. 678, 693-94, 98 S. Ct. 2565, 2575, 57 L. Ed. 2d 522 (1978), and the action seeks prospective relief, id. at 695, 98 S. Ct. at 2576, from deprivations of rights guaranteed by the Constitution and statutes of the United States."

James v. Alabama Coal. for Equity, Inc., 713 So. 2d 937, 947 (Ala. 1997) (plurality opinion). Thus, any claim for attorneys' fees arising from the Northcutts' request for prospective injunctive relief is not barred by the doctrine of qualified immunity with regard to the Northcutts' federal-law claims.

### B. Claims for Monetary Damages Against the Employee Defendants in their Individual Capacities

25

The employee defendants argue that they are entitled to federal qualified immunity as to the Northcutts' § 1983 claims for monetary damages based on allegations that the defendants violated Patti's equal-protection and due-process rights.[4]

> "Section 1983 allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law. 42 U.S.C. § 1983. In such actions, public officials sued in their individual capacities may assert the defense of qualified immunity, which shields those officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). … A public official asserting qualified immunity must first establish that he or she was acting within the scope of his or her discretionary authority at the time of the alleged constitutional violation. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004). Once a public official demonstrates that he or she was acting within the scope of his or her discretionary authority, the burden shifts to the plaintiff to show that the official was not entitled to qualified immunity. Id. 'To overcome qualified immunity, the plaintiff must satisfy a two-prong test; he must show that: (1) the [public official] violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation.' Id. If the plaintiff fails to satisfy either prong, the public official is entitled to qualified immunity. Id. In other words, it is unnecessary to address both prongs of the

---

[4]The Northcutts specifically excluded the Board defendants from their claims for monetary damages. Thus, we do not discuss whether the Board defendants would be entitled to federal qualified immunity as to these claims.

qualified-immunity analysis if addressing one is dispositive. This Court may decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.' Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)."

Ex parte City of Vestavia Hills, 372 So. 3d 1143, 1148 (Ala. 2022).

> "'While the defense of qualified immunity is typically addressed at the summary judgment stage of a case, it may be, as it was in this case, raised and considered on a motion to dismiss. See Chesser v. Sparks, 248 F.3d 1117, 1121 (11th Cir. 2001). The motion to dismiss will be granted if the "complaint fails to allege the violation of a clearly established constitutional right." Id. (citing Williams v. Ala. State Univ., 102 F.3d 1179, 1182 (11th Cir. 1997)). Whether the complaint alleges such a violation is a question of law that we review de novo, accepting the facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. Id.'

"St. George v. Pinellas County, 285 F.3d 1334, 1337 (11th Cir. 2002) (emphasis added)."

Ex parte Alabama Dep't of Youth Servs., 880 So. 2d 393, 402-03 (Ala. 2003).

> "A constitutional right is clearly established if controlling precedent has recognized the right in a 'concrete and factually defined context.' Lassiter[ v. Alabama A&M Univ., Bd. of Trs.], 28 F.3d [1146,] 1149 [(11th Cir. 1994)]; see also Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993) ('If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the

defendant.'). A plaintiff cannot avoid the qualified immunity defense 'by referring to general rules and to the violation of abstract "rights."' Lassiter, 28 F.3d at 1150. If the constitutional right has been clearly established, the plaintiff must demonstrate that a reasonable government actor would have known that what he was doing infringed that right. See Williams [v. Alabama State Univ.], 102 F.3d [1179,] 1182 [(11th Cir. 1997)]."

Chesser v. Sparks, 248 F.3d 1117, 1122 (11th Cir. 2001).

In Echols v. Lawton, 913 F.3d 1313, 1323-26 (11th Cir. 2019), the United States Court of Appeals for the Eleventh Circuit discussed a plaintiffs' burden of establishing that a defendant's conduct violated a clearly established right as follows:

"To defeat Lawton's qualified immunity, Echols must also prove that Lawton violated a constitutional right that 'was "clearly established" at the time of the challenged conduct.' Plumhoff v. Rickard, 572 U.S. 765, 778, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014) (quoting [Ashcroft v.] al-Kidd, 563 U.S. [731,] 735, 131 S. Ct. 2074 [(2011)]). An official's conduct violates clearly established law when 'the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' al-Kidd, 563 U.S. at 741, 131 S. Ct. 2074 (alterations adopted) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). We consider the official's conduct in 'the specific context of the case,' not as 'broad general proposition[s].' Bailey [v. Wheeler], 843 F.3d [473,] 484 [(11th Cir. 2016)]; see also al-Kidd, 563 U.S. at 742, 131 S. Ct. 2074 ('We have repeatedly told courts ... not to define clearly established law at a high level of generality.'). And we ask the 'salient question ... whether the state of law at the time of [an official's conduct] provided "fair warning,"

to every reasonable official that the conduct clearly violates the Constitution. Mikko [v. City of Atlanta], 857 F.3d [1136,] 1146 [(11th Cir. 2017)].

"Echols can 'demonstrate that the contours of the right were clearly established in one of three ways.' Loftus v. Clark-Moore, 690 F.3d 1200, 1204 (11th Cir. 2012) (alteration adopted) (citation and internal quotation marks omitted). First, he can point us to a 'materially similar case [that] has already been decided.' Id. (citation and quotation marks omitted). Second, he can point us to 'a broader, clearly established principle that should control the novel facts of the situation.' Id. (alterations adopted). Third, 'the conduct involved in the case may so obviously violate the [C]onstitution that prior case law is unnecessary.' Id. at 1205 (alterations adopted). Echols's arguments fail under all of these approaches.

"Echols contends that an assortment of decisions clearly established Lawton's violation of his rights, but he cites no controlling precedent that would have provided Lawton fair notice that his conduct would violate the First Amendment. Although '[w]e do not require a case directly on point, [some] existing precedent must have placed the ... constitutional question beyond debate.' al-Kidd, 563 U.S. at 741, 131 S. Ct. 2074. We look only to binding precedent at the time of the challenged conduct -- that is, 'the decisions of the Supreme Court, the Eleventh Circuit, or the highest court of the state.' Bailey, 843 F.3d at 483-84. And a clearly established violation of state law cannot put an official on notice that his conduct would also violate the Constitution because 'section 1983 protects only against violations of federally protected rights.' Casines v. Murchek, 766 F.2d 1494, 1501 n.10 (11th Cir. 1985).

"Echols relies either on precedents that are inapposite, see, e.g., United States v. Noriega, 117 F.3d 1206, 1220 (11th Cir. 1997) (discussing a prosecutor's duty not to present false

29

evidence during a judicial proceeding), or on decisions that are not precedential, see, e.g., Lucas v. Parish of Jefferson, 999 F. Supp. 839 (E.D. La. 1998). And he relies on decisions from other jurisdictions, some of which even postdate Lawton's alleged violation, see, e.g., Whitlock v. Brueggemann, 682 F.3d 567, 581 (7th Cir. 2012). Although Lawton clearly would have had fair notice that his alleged writing constituted libel per se under state tort law, he would not have understood that his alleged libel would have violated the First Amendment. No controlling precedent put Lawton's alleged violation beyond debate.

"Echols also relies on the broader principle 'that the act of retaliation for the exercise of constitutional rights is clearly established as a violation,' but this general principle is too broadly stated to control our inquiry. '[S]ome broad statements of principle in case law [that] are not tied to particularized facts ... can clearly establish law applicable in the future to different sets of detailed facts.' Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002). But the principle must establish with 'obvious clarity' that 'in the light of pre-existing law the unlawfulness [of the official's conduct is] apparent.' Id. at 1353. True, 'it is "settled law" that the government may not retaliate against citizens for the exercise of First Amendment rights.' Bennett [v. Hendrix], 423 F.3d [1247,] 1256 [(11th Cir. 2005)]. But that general principle does not resolve with 'obvious clarity' that defamation may constitute retaliation in violation of the First Amendment. See also Reichle v. Howards, 566 U.S. 658, 665, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012) (rejecting the argument that 'the general right to be free from retaliation for one's speech' clearly establishes a violation of the First Amendment).

"Echols also fails to persuade us that Lawton's conduct 'so obviously violate[d] the [C]onstitution that prior case law is unnecessary.' Loftus, 690 F.3d at 1205. 'This narrow category encompasses those situations where the official's

30

conduct lies so obviously at the very core of what the relevant constitutional provision prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.' Id. (alteration adopted) (internal quotation marks omitted) (quoting Terrell v. Smith, 668 F.3d 1244, 1257 (11th Cir. 2012)). '[I]n the absence of controlling precedent, cases decided outside this Circuit can buttress our view that the applicable law was not already clearly established' because '[w]e must not hold [officials] to a higher standard of legal knowledge than that displayed by the federal courts in reasonable and reasoned decisions.' Youmans v. Gagnon, 626 F.3d 557, 565 (11th Cir. 2010).

"Lawton's conduct does not fall within this 'narrow category.' As we have explained, our sister circuits are divided over whether an official's defamatory speech is actionable as retaliation under the First Amendment. It has certainly not been obvious to the federal courts that an official's defamatory speech lies at the core of what the First Amendment prohibits. '[W]here judges thus disagree on a constitutional question,' we cannot 'expect that reasonable [officials] know more than reasonable judges about the law.' Id. (citations and quotation marks omitted). So we cannot say that it would have been 'readily apparent' to every reasonable official that Lawton's alleged defamation violated the First Amendment. Id.

"Critics of the doctrine of qualified immunity condemn 'letting [an] official duck consequences for bad behavior.' Zadeh v. Robinson, 902 F.3d 483, 498 (Willett, J., concurring dubitante) (5th Cir. 2018); William Baude, Is Qualified Immunity Unlawful?, 106 Calif. L. Rev. 45 (2018). And we too condemn Lawton's alleged conduct. But the Supreme Court has long ruled that qualified immunity protects a badly behaving official unless he had fair notice that his conduct would violate the Constitution, District of Columbia v. Wesby, 583 U.S. 48, 138 S. Ct. 577, 589-91, 199 L. Ed. 2d 453 (2018); Kisela v. Hughes, 584 U.S. 100, 138 S. Ct. 1148, 1152, 200 L.

31

Ed. 2d 449 (2018), though at least one justice may harbor doubts, see Ziglar v. Abbasi, 582 U.S. 120, 137 S. Ct. 1843, 1872, 198 L. Ed. 2d 290 (2017) (Thomas, J., concurring in part and in the judgment) ('In an appropriate case, we should reconsider our qualified immunity jurisprudence.'). 'Because the Constitution's general provisions can be abstract,' fair notice protects an official from 'liab[ility] for conduct that [he could] reasonably believe[] was lawful.' Aaron L. Nielson & Christopher J. Walker, A Qualified Defense of Qualified Immunity, 93 Notre Dame L. Rev. 1853, 1873 (2018). So even when an official behaves badly, 'qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.' al-Kidd, 563 U.S. at 743, 131 S. Ct. 2074.

"Recall that the Constitution does not provide the only standard for redress for those wronged by public officials. For example, Lawton's alleged conduct could have been reviewed and sanctioned by the State Bar. See Ga. R. Prof'l Conduct 3.8(g), 8.4. Echols could have also filed a claim under state tort law against Lawton. See Cottrell [v. Smith], [299 Ga. 517,] 788 S.E.2d [772,] 780-81 [(2016)]. But Echols chose to frame his complaint as a federal case alleging a violation of the Constitution, 42 U.S.C. § 1983.

"Section 1983 is not a 'font of tort law [that] converts [every] state law tort claim[] into [a] federal cause[] of action.' Waddell [v. Hendry Cnty. Sheriff's Off.], 329 F.3d [1300,] 1305 [(11th Cir. 2003)] (citation and internal quotation marks omitted). When a plaintiff complains that a public official has violated the Constitution, qualified immunity shields the official from individual liability unless he had fair notice that his alleged conduct would violate 'the supreme Law of the Land.' U.S. Const. Art. VI. Because Lawton lacked that fair notice, he enjoys qualified immunity from Echols's claim of retaliation."

### 1. § 1983 Equal-Protection Claim

In Count 3 of the third amended complaint, the Northcutts asserted

a class-of-one equal-protection claim.

> "In a 'class of one' claim, a plaintiff alleges not that it belongs
> to a protected class, but that it is the only entity being treated
> differently from all other similarly situated entities. Vill. of
> Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 145
> L. Ed. 2d 1060 (2000) (per curiam). In order to prevail, a
> plaintiff must show that it 'has been intentionally treated
> differently from others similarly situated and that there is no
> rational basis for the difference in treatment.' PBT Real Est.,
> LLC v. Town of Palm Beach, 988 F.3d 1274, 1285 (11th Cir.
> 2021)."

Chabad Chayil, Inc. v. School Bd. of Miami-Dade Cnty., Fla., 48 F.4th

1222, 1233 (11th Cir. 2022).

The employee defendants argue that the trial court erred in

denying their motion to dismiss the Northcutts' equal-protection claim

seeking monetary damages, alleging, in pertinent part:

> "Northcutt's equal protection claim is barred on the
> merits by governing precedent, specifically by the U.S.
> Supreme Court's holding in En[g]quist v. Oregon Department
> of Agriculture.[, 553 U.S. 591 (2008),] that allowing class-of-
> one equal protection claims, like Northcutt's, 'in the context of
> public employment would impermissibly constitutionalize the
> employee grievance.' 553 U.S. [at] 609 …; see DeFabio v. East
> Hampton Union Free School Dist., 659 F. Supp. 2d 461, 494
> (E.D.N.Y. 2009) ('Decisions that defendants make on a day-to-
> day basis to ensure the safety and welfare of the students
> under their care are necessarily discretionary ones. Because
> defendants acted within their discretionary powers, plaintiffs'
> "class of one" equal protection claims must fail.'); Yan v. Penn.

33

State Univ., Case No. 10-00212 … (M.D. Pa. Aug. 13, 2010) (holding that En[g]quist precluded the plaintiff from bringing a class-of-one equal protection claim against the university for her expulsion for a PhD program). And if there is no violation, there can obviously be no clearly established violation."

Petition, pp. 23-24.

In their brief to this Court, the Northcutts state:

"The function of equal protection under the Fourteenth Amendment 'is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). In a 'class of one' claim, a plaintiff needs to allege different treatment from others that are similarly situated, and there is no rational basis for the different treatment. Id. A government action can be shown to lack a rational basis when the action was 'irrational and wholly arbitrary.' See id. at 565. Public university officials cannot act arbitrarily towards students. Regents of University of Michigan v. Ewing, 474 U.S. 214, 223-25 (1985). An academic decision at a university is arbitrary if the officials in making their decision: (1) 'concealed nonacademic or constitutionally impermissible reasons,' (2) acted in bad faith, or (3) 'is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgement.' Id. at 225.

"[Defendants] correctly point out that, class of one equal protection claims do not have an application [in] the context of public employment. (Exhibit B p.7-8 (discussing Engquist v. Oregon Dept. of Agr., 553 U.S. 591 (2008)). However, this case has further considerations than an at will employment case does in Engquist. First, while a student can leave an institution … for any reason, a public university cannot get

34

rid of a student for any reason whatsoever. See Ewing, 474 U.S. at 223-25. A student cannot be arbitrarily removed by the institution when they are adhering to the conditions (both disciplinary and academic) that they agreed to when they enrolled in the institution. See id.; Nash v. Auburn University, 621 F. Supp. 948, 960 (M.D. Ala. 1985). Thus, there is no power for employees of an institution to get rid of a student for any reason like they could an at-will employee.

"....

"[The Northcutts] admit in good faith that this exact factual scenario likely does not exist (a former public university employee, who has previously settled a retaliation suit, being retaliated against again as a student at that same institution for the previous lawsuit) but the principles arising from the cases on these subjects should still control, unless the [defendants'] conduct so obviously violate[s] the [constitution that] prior case law is unnecessary.

"It is a well settled and clearly established principle that a government action can be shown to lack a rational basis when the action was 'irrational and wholly arbitrary.' Olech, 528 U.S. at 565. The principle that public university officials cannot act arbitrarily towards students is a matter of settled law. Ewing, 474 U.S. at 223-25."

Northcutts' brief, pp. 17-20.

In this case, the Northcutts have failed to establish that the employee defendants' conduct violated clearly established law.

In Engquist v. Oregon Department of Agriculture, 553 U.S. 591, 601-08 (2008), the United States Supreme Court stated:

35

"Our equal protection jurisprudence has typically been concerned with governmental classifications that 'affect some groups of citizens differently than others.' McGowan v. Maryland, 366 U.S. 420, 425 (1961). See, e.g., Ross v. Moffitt, 417 U.S. 600, 609 (1974) ('"Equal protection" ... emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable'); San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 60 (1973) (Stewart, J., concurring) ('[T]he basic concern of the Equal Protection Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes'). Plaintiffs in such cases generally allege that they have been arbitrarily classified as members of an 'identifiable group.' Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 279 (1979).

"Engquist correctly argues, however, that we recognized in [Village of Willowbrook v.] Olech[, 528 U.S. 562 (2000),] that an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.' In Olech, a property owner had asked the village of Willowbrook to connect her property to the municipal water supply. Although the village had required only a 15-foot easement from other property owners seeking access to the water supply, the village conditioned Olech's connection on a grant of a 33-foot easement. Olech sued the village, claiming that the village's requirement of an easement 18 feet longer than the norm violated the Equal Protection Clause. Although Olech had not alleged that the village had discriminated against her based on membership in an identifiable class, we held that her complaint stated a valid claim under the Equal Protection Clause because it alleged that she had 'been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' 528 U.S., at 564 (citing Sioux City Bridge Co. v. Dakota County,

36

260 U.S. 441 (1923), and <u>Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.</u>, 488 U.S. 336 (1989)).

"Recognition of the class-of-one theory of equal protection on the facts in <u>Olech</u> was not so much a departure from the principle that the Equal Protection Clause is concerned with arbitrary government classification, as it was an application of that principle. That case involved the government's regulation of property. Similarly, the cases upon which the Court in <u>Olech</u> relied concerned property assessment and taxation schemes. <u>See</u> <u>Allegheny Pittsburgh</u>, <u>supra</u>; <u>Sioux City Bridge</u>, <u>supra</u>. We expect such legislative or regulatory classifications to apply 'without respect to persons,' to borrow a phrase from the judicial oath. See 28 U.S.C. § 453. As we explained long ago, the Fourteenth Amendment 'requires that all persons subjected to ... legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed.' <u>Hayes v. Missouri</u>, 120 U.S. 68, 71-72 (1887). When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to ensure that all persons subject to legislation or regulation are indeed being 'treated alike, under like circumstances and conditions.' Thus, when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a 'rational basis for the difference in treatment.' <u>Olech</u>, 528 U.S., at 564.

"What seems to have been significant in <u>Olech</u> and the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. There was no indication in <u>Olech</u> that the zoning board was exercising discretionary authority based on subjective, individualized determinations -- at least not with regard to easement length, however typical such determinations may be as a general zoning matter. See <u>id.</u>, at

565 (BREYER, J., concurring in result). Rather, the complaint alleged that the board consistently required only a 15-foot easement, but subjected Olech to a 33-foot easement. This differential treatment raised a concern of arbitrary classification, and we therefore required that the State provide a rational basis for it.

"In Allegheny Pittsburgh, cited by the Olech Court, the applicable standard was market value, but the county departed from that standard in basing some assessments on quite dated purchase prices. Again, there was no suggestion that the 'dramatic differences in valuation' for similar property parcels, 488 U.S., at 341, were based on subjective considerations of the sort on which appraisers often rely, see id., at 338-342, 345. Sioux City Bridge, also cited in Olech, was the same sort of case, recognizing an equal protection claim when one taxpayer's property was assessed at 100 percent of its value, while all other property was assessed at 55 percent, without regard to articulated differences in the properties. See 260 U.S., at 445-447.

"There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

"Suppose, for example, that a traffic officer is stationed on a busy highway where people often drive above the speed limit, and there is no basis upon which to distinguish them. If the officer gives only one of those people a ticket, it may be good English to say that the officer has created a class of

38

people that did not get speeding tickets, and a 'class of one' that did. But assuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been singled out for no reason does not invoke the fear of improper government classification. Such a complaint, rather, challenges the legitimacy of the underlying action itself -- the decision to ticket speeders under such circumstances. Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns. But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action. <u>It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized</u>.

"<u>This principle applies most clearly in the employment context, for employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify</u>. As Engquist herself points out, '[u]nlike the zoning official, the public employer often must take into account the individual personalities and interpersonal relationships of employees in the workplace. The close relationship between the employer and employee, and the varied needs and interests involved in the employment context, mean that considerations such as concerns over personality conflicts that would be unreasonable as grounds for "arm's-length" government decisions (<u>e.g.</u>, zoning, licensing) may well justify different treatment of a public employee.' Brief for Petitioner 48. Unlike the context of arm's-length regulation, such as in <u>Olech</u>, treating seemingly similarly situated individuals differently in the employment context is par for the course.

"Thus, the class-of-one theory of equal protection -- which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review -- is simply a poor fit in the public employment context. To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship. A challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action.

"Of course, that is not to say that the Equal Protection Clause, like other constitutional provisions, does not apply to public employers. Indeed, our cases make clear that the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently. See, e.g., [New York City Transit Auth. v.] Beazer, 440 U.S. [568,] 593 [(1979)] (upholding city's exclusion of methadone users from employment under rational-basis review); [Harrah Indep. Sch. Dist. v.] Martin, 440 U.S. [194,] 199-201 [(1979)] (classification between teachers who had complied with a continuing-education requirement and those who had not is rational and does not violate the Equal Protection Clause); [Massachusetts Bd. of Ret. v.] Murgia, 427 U.S. [307,] 314-317 [(1976)] (upholding a mandatory retirement age -- a classification based on age -- under rational-basis review). The dissent's broad statement that we 'excep[t] state employees from the Fourteenth Amendment's protection against unequal and irrational treatment at the hands of the State,' post, at 610 (opinion of STEVENS, J.), is thus plainly not correct. But we have never found the Equal Protection Clause implicated in the specific circumstance where, as here, government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner.

"....

"In concluding that the class-of-one theory of equal protection has no application in the public employment context -- and that is all we decide -- we are guided, as in the past, by the 'common-sense realization that government offices could not function if every employment decision became a constitutional matter.' Connick [v. Myers, 366 U.S. 138,] 143 [(1983)]. If, as Engquist suggests, plaintiffs need not claim discrimination on the basis of membership in some class or group, but rather may argue only that they were treated by their employers worse than other employees similarly situated, any personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal constitutional claim. Indeed, an allegation of arbitrary differential treatment could be made in nearly every instance of an assertedly wrongful employment action -- not only hiring and firing decisions, but any personnel action, such as promotion, salary, or work assignments -- on the theory that other employees were not treated wrongfully. See [Engquist v. Oregon Dep't of Agric.,] 478 F.3d [985,] 995 [(9th Cir. 2007)]. On Engquist's view, every one of these employment decisions by a government employer would become the basis for an equal protection complaint."

Engquist, 553 U.S. at 601-08 (emphasis added). In this case, the Northcutts' class-of-one equal-protection claim based on allegations that the employee defendants failed to consider Patti for various jobs at Auburn would be barred by Engquist.

With regard to their class-of-one equal-protection claim arising out of Patti's participation in the doctoral program, the Northcutts discount

41

the employee defendants' reliance on <u>Engquist</u> because that case involved public employment. However, courts in various jurisdictions are split as to whether <u>Engquist</u>'s limitation on class-of-one equal-protection claims applies only in the public-employment context or whether it also applies to other types of discretionary governmental conduct. In <u>Analytical Diagnostic Labs, Inc. v. Kusel</u>, 626 F.3d 135 (2d Cir. 2010), the United States Court of Appeals for the Second Circuit discussed this split, stating:

> "Our Court has yet to address whether <u>Engquist</u>'s prohibition is limited to the public employment context, or whether it extends to other types of discretionary government behavior. Several district courts in this Circuit have extended <u>Engquist</u>'s holding to require that plaintiffs seeking to establish a class-of-one claim must show the difference in treatment flowed from non-discretionary action, but they have done so without persuasive analysis. <u>See, e.g.</u>, <u>Dunlea v. Federal Bureau of Prisons</u>, No. 3:10-cv-214, 2010 WL 1727838, at *3-4 (D. Conn. April 26, 2010) (dismissing class-of-one claim for prisoner denied use of prison email system); <u>Tarantino v. City of Hornell</u>, 615 F. Supp. 2d 102, 116-17 (W.D.N.Y. 2009) (dismissing class-of-one claim challenging discretionary decision to enforce city codes). Conversely, in <u>Alfaro v. Labrador</u>, the Eastern District of New York rejected other courts' findings that a class-of-one claim never can be brought in a law enforcement context. No. 06-CV-1470, 2009 WL 2525128, at *8-11 (E.D.N.Y. Aug. 14, 2009). Rather, Judge Seybert read <u>Engquist</u> and <u>Olech</u> to define 'discretionary decisions, for the purpose of barring class-of-one claims, as those that involve discretion that is actually exercised on a day-to-day basis, rather than decisions that are

42

theoretically discretionary but -- as a practical matter -- actually depend on de facto standards.' Id. at *9. She allowed Alfaro's claim that he was unconstitutionally singled out for zoning violations to go forward.

"Our sister Circuits are equally split. In a nonbinding decision, the Sixth Circuit held that Engquist likely was limited to the public employment context and probably did not control in a class-of-one claim in a denial of parole case. Franks v. Rubitschun, 312 Fed. Appx. 764, 766 n.3 (6th Cir. 2009). Conversely, the Eleventh Circuit extended Engquist to claims by government contractors, finding that '[j]ust as in the employee context, and in the absence of a restricting contract or statute, decisions involving government contractors require broad discretion that may rest "on a wide array of factors that are difficult to articulate and quantify."' Douglas Asphalt Co. v. Qore, Inc., 541 F.3d 1269, 1274 (11th Cir. 2008) (citation omitted). Similarly, the Eighth Circuit found a police officer's investigative decisions could not be challenged with a class-of-one equal protection claim because such decisions are inherently discretionary. Flowers v. City of Minneapolis, 558 F.3d 794, 799-800 (8th Cir. 2009).

"The Seventh Circuit issued several decisions expanding Engquist beyond public employment. See Srail v. Village of Lisle, 588 F.3d 940, 944-45 (7th Cir. 2009) (applying Engquist to a municipality's 'subjective and individualized assessment' to extend municipal water to some communities but not others); United States v. Moore, 543 F.3d 891, 901 (7th Cir. 2008) (applying Engquist to bar class-of-one claims challenging prosecutorial decisions). However, in Hanes v. Zurick, the Seventh Circuit declined to apply Engquist to bar a class-of-one claim alleging that the police defendants repeatedly arrested plaintiff without cause. 578 F.3d 491, 495-96 (2009).

"The Hanes court looked at the reasons underlying the Engquist decision:

43

"'First, the Court emphasized that the judgments unsuited to a class-of-one claim are typically "subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." That describes employment decisions because treating like individuals differently in the employment context is "par for the course." Second, the Court noted that the constitutional constraints on government are much less onerous when it acts as employer as compared to acting as sovereign. Finally, the Court recognized that, in the employment context, an uncabined class-of-one theory risks making a constitutional case out of every decision by a government employer.'

"Id. at 495 (citations omitted). However, the Hanes court concluded, that does not mean every class-of-one claim involving any discretionary state action is barred. Id. at 495-96. Indeed, the Hanes court held Engquist did not bar plaintiff's claim because not all discretionary activity is 'off-limits from class-of-one claims.' Id. at 495.

"We join the Seventh Circuit in holding that Engquist does not bar all class-of-one claims involving discretionary state action. While there may be some circumstances where Engquist is properly applied outside of the employment context, the case before us is not one of them."

626 F.3d at 141-42.

In Carruth v. Bentley, 942 F.3d 1047 (11th Cir. 2019), the Eleventh Circuit Court of Appeals addressed the validity of a class-of-one equal-protection claim outside the public-employment context. In that case, "John Dee Carruth, the former CEO of Alabama One Credit Union, sued

44

former Governor of Alabama Robert Bentley and his legal advisor, David Byrne, after Alabama One was taken into conservatorship by a state agency and he was terminated." 942 F.3d at 1050. Carruth asserted various claims under § 1983, including an equal-protection claim, and three state-law claims. The United States District Court for the Northern District of Alabama dismissed Carruth's civil-rights claims on the ground of federal qualified immunity and declined to entertain Carruth's state-law claims, and Carruth appealed the dismissal of his civil-rights claims. With regard to Carruth's equal-protection claim, the Eleventh Circuit Court of Appeals stated:

> "The Supreme Court first explicitly recognized the 'class of one' equal protection theory in Village of Willowbrook v. Olech, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) (per curiam). In Olech, the plaintiff claimed that the Village demanded a 33-foot easement as a condition of connecting her property to the municipal water supply, while it only asked for a 15-foot easement from similarly situated property owners. She alleged that the difference was 'irrational and wholly arbitrary,' and said that a 15-foot easement was 'clearly adequate.' Id. at 565, 120 S. Ct. 1073. The Supreme Court held that the plaintiff's complaint stated a valid 'class of one' equal protection claim. Id.
>
> "In a later case, the Court explained that the class of one theory applies when there is 'a clear standard against which departures, even for a single plaintiff, [can] be readily assessed.' Engquist v. Or. Dep't of Agr., 553 U.S. 591, 602, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008). The Court went on:

45

"'There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.'

"Id. at 603, 128 S. Ct. 2146. Thus, the Supreme Court held that the class of one theory 'has no application' in the context of public employment decisions, since it would open up too many discretionary governmental decisions to equal protection claims. Id. at 607, 128 S. Ct. 2146.

"We conclude that the class of one equal protection theory similarly has no application to the decision to place Alabama One in conservatorship or to terminate Carruth as its CEO. As the district court observed, it is difficult to 'envision a better example of discretionary decisionmaking than whether to conserve a Credit Union and terminate certain of its employees.' The decision to conserve a credit union and depose its leadership is a major one, as Carruth tells us, and it requires the [state agency] to make 'a vast array of subjective, individualized assessments.' Id. at 603, 128 S. Ct. 2146. For a state regulatory agency to do its job effectively, it must be able to take into account all of the relevant facts and circumstances of the individual cases before it. In Griffin Industries, Inc. v. Irvin, 496 F.3d 1189 (11th Cir. 2007), this Court held that state government officials were entitled to qualified immunity from a similar

46

class of one claim brought by a company that operated a chicken rendering plant. Id. at 1207. The company claimed that the officials subjected the plant to stricter environmental regulation than other similarly situated facilities. Id. at 1194-95. We rejected the claim, explaining that unlike in Olech, the regulatory decisions involved were 'multi-dimensional,' with 'varied decisionmaking criteria applied in a series of discretionary decisions made over an extended period of time.' Id. at 1203. When the challenged government action 'is not the product of a one-dimensional decision' it is more difficult to make out a class of one claim. Id. at 1203-04. The various decisions made by the defendants and other state officials leading up to the conservatorship of Alabama One are similarly complex and multidimensional. Carruth has not pointed to any 'one-dimensional decision' that shows that he and Alabama One were treated arbitrarily or dissimilarly from similarly situated entities."

Carruth v. Bentley, 942 F.3d at 1057-58. Thus, the Eleventh Circuit Court of Appeals has applied Engquist's limitation on class-of-one claims to cases involving discretionary governmental conduct other than those cases involving public employment.

Additionally, in Yan v. Penn State University, No. 4:10-CV-00212, Aug. 13, 2010 (M.D. Penn. 2010) (not reported in Federal Supplement), the United States District Court for the Middle District of Pennsylvania applied Engquist's limitation to a class-of-one equal-protection claim arising out Yan Yan's removal from a graduate program. In that case, Yan asserted a class-of-one equal-protection claim arising out of her

47

expulsion from her Ph.D. program at Penn State University. In addressing whether Engquist "prohibt[ed] her class-of-one claim in the graduate student context," the United States District Court for the Middle District of Pennsylvania stated:

"In a case similar to the instant matter, the Seventh Circuit held that the rationale of Engquist applied to a student's class-of-one Equal Protection claim for expulsion from optometry school. Bissessur v. Indiana Univ. Bd. of Trustees, 2008 U.S. Dist. LEXIS 69299, 2008 WL 4274451 (S.D. Ind. September 10, 2008) (Barker, J.), aff'd 581 F.3d 599 (7th Cir. 2009). That court stated that '[t]he Supreme Court's rationale in Engquist effectively forecloses his claim ... [i]n light of the Supreme Court's recent limitation on the availability of class of one claims in the context of discretionary decision making.' Id, at *27.

"We agree with the Southern District of Indiana and hold that the class-of-one claim brought by Yan against defendants for expelling her from the Ph.D. program is not actionable. Counts V and VII will be dismissed."

"The United States Supreme Court noted in Wilson v. Layne, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999), that the law was not clearly established where the 'state of the law was … at best undeveloped.'" Ex parte State Board of Education, 219 So. 3d 604, 616 (2016) (plurality opinion). Additionally, in Echols v. Lawton, 913 F.3d at 1325, the Eleventh Circuit Court of Appeals stated:

48

"Echols also fails to persuade us that Lawton's conduct 'so obviously violate[d] the [C]onstitution that prior case law is unnecessary.' Loftus [v. Clark-Moore], 690 F.3d [1200,] 1205 [(11th Cir. 2012)]. 'This narrow category encompasses those situations where the official's conduct lies so obviously at the very core of what the relevant constitutional provision prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.' Id. (alteration adopted) (internal quotation marks omitted) (quoting Terrell v. Smith, 668 F.3d 1244, 1257 (11th Cir. 2012)). '[I]n the absence of controlling precedent, cases decided outside this Circuit can buttress our view that the applicable law was not already clearly established' because '[w]e must not hold [officials] to a higher standard of legal knowledge than that displayed by the federal courts in reasonable and reasoned decisions.' Youmans v. Gagnon, 626 F.3d 557, 565 (11th Cir. 2010).

"Lawton's conduct does not fall within this 'narrow category.' As we have explained, our sister circuits are divided over whether an official's defamatory speech is actionable as retaliation under the First Amendment. It has certainly not been obvious to the federal courts that an official's defamatory speech lies at the core of what the First Amendment prohibits. '[W]here judges thus disagree on a constitutional question,' we cannot 'expect that reasonable [officials] know more than reasonable judges about the law.' Id. (citations and quotation marks omitted). So we cannot say that it would have been 'readily apparent' to every reasonable official that Lawton's alleged defamation violated the First Amendment. Id."

(Final emphasis added.) See also Badia v. City of Miami, 133 F.3d 1443

(11th Cir. 1998).

49

Based on the unsettled caselaw regarding the validity of a class-of-one equal-protection claim based on discretionary governmental conduct outside the public-employment context, the Northcutts have not demonstrated that their complaint alleged the violation of a clearly established constitutional right. Therefore, the employee defendants were entitled to federal qualified immunity as to the Northcutts' federal equal-protection claim seeking monetary damages, and the trial court erred when it denied the employee defendants' motion to dismiss as to that claim.

### 2. § 1983 Due-Process Claims

Relying in part on Cotton v. Jackson, 216 F.3d 1328 (11th Cir. 2000), the employee defendants also argue that the Northcutts fail "to plead a procedural due process claim on the merits or a violation of clearly established law." Petition, p. 24. In Cotton, the Eleventh Circuit Court of Appeals stated:

> "In McKinney v. Pate, 20 F.3d 1550, 1557 (11th Cir. 1994)(en banc), we said that 'only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise.' It is the state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim. See id.; see also Bass v. Perrin, 170 F.3d 1312,

50

1319 (11th Cir. 1999); Harris v. Board of Educ., 105 F.3d 591, 596 (11th Cir. 1997). This rule (that a section 1983 claim is not stated unless inadequate state procedures exist to remedy an alleged procedural deprivation) recognizes that the state must have the opportunity to 'remedy the procedural failings of its subdivisions and agencies in the appropriate fora -- agencies, review boards, and state courts' before being subjected to a claim alleging a procedural due process violation. See McKinney, 20 F.3d at 1560; see also Horton v. Board of County Comm'rs, 202 F.3d 1297, 1300 (11th Cir. 2000).

"Assuming a plaintiff has shown a deprivation of some right protected by the due process clause, we -- when determining if a plaintiff has stated a valid procedural due process claim -- look to whether the available state procedures were adequate to correct the alleged procedural deficiencies. See McKinney, 20 F.3d at 1563; see also Bell v. City of Demopolis, Alabama, 86 F.3d 191, 192 (11th Cir. 1996); Narey v. Dean, 32 F.3d 1521, 1527-28 (11th Cir. 1994). If adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process. See McKinney, 20 F.3d at 1565 ('The fact that [McKinney] failed to avail himself of the full procedures provided by state law ... does not constitute a sign of their inadequacy.'); Bell, 86 F.3d at 192; Narey, 32 F.3d at 1528. And, to be adequate, the state procedure need not provide all the relief available under section 1983. See McKinney, 20 F.3d at 1564. Instead, the state procedure must be able to correct whatever deficiencies exist and to provide plaintiff with whatever process is due."

216 F.3d at 1330-31 (footnotes omitted). As the Eleventh Circuit Court of Appeals noted in Lambert v. Board of Trustees, 793 F. App'x 938, 943 (11th Cir. 2019):

51

"In Alabama, a party may seek relief from the state courts, which hear lawsuits involving claims by public university students relating to arbitrary, capricious, or bad-faith grading. See, e.g., Burch v. Moulton, 980 So. 2d 392, 398-99 (Ala. 2007) (recognizing 'that [public university officials] have discretion in determining a student's academic status'); Hartman v. Bd. of Trustees of Univ. of Ala., 436 So. 2d 837, 840-41 (Ala. 1983)."

Additionally, in their third amended complaint, the Northcutts did not allege that there were no adequate state remedies available to address any alleged deprivation of Patti's right to procedural due process. "[A] procedural due process claim can exist only if no adequate state remedies are available." See Flagship Lake Cnty. Dev. No. 5, LLC v. City of Mascotte, Fla., 559 F. App'x 811, 815 (11th Cir. 2014). Accordingly, the Northcutts' complaint failed to allege a violation of a clearly established constitutional right with regard to their federal due-process claim. Therefore, the employee defendants were entitled to federal qualified immunity as to the Northcutts' federal procedural-due-process claim seeking monetary damages, and the trial court erred when it denied the employee defendants' motion to dismiss as to that claim.

## II. State-Law Claims

In Counts 5-8 of the third amended complaint, the Northcutts asserted claims of breach of contract and intentional interference with

contractual relations. In Count 5, the Northcutts alleged that the Board defendants, Gogue, Lee, Kerpelman, Rahman, Flowers, Hammer, Roberts, Maxwell-Evans, and McCormick breached the settlement agreements arising out of Patti's previous lawsuits. In Count 6, the Northcutts alleged that the Board defendants, Gogue, Lee, Kerpelman, Rahman, Flowers, Hammer, Roberts, Maxwell-Evans, and McCormick intentionally interfered with the settlement agreements. In Count 7, the Northcutts alleged that the Board defendants, Gogue, Lee, Kerpelman, Rahman, Flowers, O'Neill, and Hammer breached the student/university contract. In Count 8, the Northcutts alleged that the Board defendants, Gogue, Lee, Kerpelman, Rahman, Flowers, O'Neill, and Hammer intentionally interfered with the student/university contract. The defendants argue that they are entitled to dismissal of the Northcutts' state-law claims on the ground of State immunity, pursuant to Art. I, § 14, Ala. Const. 2022.

> "Alabama's Constitution codifies the longstanding legal principle that sovereign States are immune from suit, providing that 'the State of Alabama shall never be made a defendant in any court of law or equity.' Ala. Const. 1901, Art. I, § 14 (Off. Recomp.). Section 14's grant of State immunity is a jurisdictional bar[3] -- it strips courts of all power to adjudicate claims against the State, even if the State has not raised its immunity as a defense. Ex parte Alabama Dep't of

Transp., 985 So. 2d 892, 894 (Ala. 2007); but see Ex parte Moulton, 116 So. 3d 1119, 1131 (Ala. 2013) (listing several types of actions not within the prohibition of § 14).

"Section 14 applies not only to suits against the State and its agencies, but also to 'official-capacity' suits against State officers, employees, and agents.[4] § 36-1-12(b), Ala. Code 1975. That is because a suit against a State agent in his 'official capacity' is equivalent to a suit against the office itself. Haley v. Barbour Cnty., 885 So. 2d 783, 788 (Ala. 2004). This rule explains why claims filed against an officer in his 'official capacity' run not just against the named official but against all his successors in office. See Ex parte Alabama Dep't of Mental Health & Mental Retardation, 937 So. 2d 1018, 1021 n.6 (Ala. 2006). It also explains why official-capacity claims seeking money damages constitute an impermissible attempt to reach 'the public coffers': damages awarded against a State agent in his official capacity presumably would come from the State treasury rather than the agent's personal assets. Suttles v. Roy, 75 So. 3d 90, 98 (Ala. 2010).

"Unlike an official-capacity claim, an individual-capacity claim seeks to hold a government official or employee personally liable, and to the extent that it seeks monetary recovery, it demands it from the individual himself rather than from a 'governmental entity' or the State treasury. Id. Because genuine individual-capacity claims run against officers personally, not against the State, we have traditionally held that such claims cannot trigger § 14's jurisdictional bar. See [Ex parte] Sawyer, 984 So. 2d [1100,] 1108 [(Ala. 2007)].

"It sometimes happens, however, that a plaintiff will label a claim an 'individual capacity' claim even though the substance of that claim makes clear that the State is, in reality, the adverse party. In such a circumstance, this Court has long held that substance trumps form: the so-called individual-capacity claim is functionally a claim against the

54

State and therefore barred by § 14. See Glass v. Prudential Ins. Co. of Am., 246 Ala. 579, 586, 22 So. 2d 13, 19 (1945).

"_____

"[3]State immunity has sometimes been referred to as '§ 14 immunity,' 'sovereign immunity,' or 'State-sovereign immunity,' though this Court's recent jurisprudence does not favor these terms.

"[4]For purposes of this case, we do not distinguish between 'officers,' 'employees,' and 'agents'; those terms are used interchangeably in this opinion."

Ex parte Pinkard, 373 So. 3d 192, 198-99 (Ala. 2022).

"'Section 14 immunity, however, is not always absolute; there are actions against State officials that are not barred by the general rule of sovereign immunity.

"'"[C]ertain actions are not barred by § 14. There are six general categories of actions that do not come within the prohibition of § 14: (1) actions brought to compel State officials to perform their legal duties; (2) actions brought to enjoin State officials from enforcing an unconstitutional law; (3) actions to compel State officials to perform ministerial acts; (4) actions brought against State officials under the Declaratory Judgments Act, Ala. Code 1975, § 6-6-220 et seq., seeking construction of a statute and its application in a given situation; (5) valid inverse condemnation actions brought against State officials in their

representative capacity; and (6) actions for injunction or damages brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law. See Drummond Co. v. Alabama Dep't of Transp., 937 So. 2d 56, 58 (Ala. 2006) (quoting Ex parte Carter, 395 So. 2d 65, 68 (Ala. 1980)); Alabama Dep't of Transp. v. Harbert Int'l, Inc., 990 So. 2d 831 (Ala. 2008) (holding that the exception for declaratory-judgment actions applies only to actions against State officials). As we confirmed in Harbert, these 'exceptions' to sovereign immunity apply only to actions brought against State officials; they do not apply to actions against the State or against State agencies. See Alabama Dep't of Transp., 990 So. 2d at 840-41."

"'Ex parte Alabama Dep't of Fin., 991 So. 2d 1254, 1256-57 (Ala. 2008). In Ex parte Moulton, 116 So. 3d 1119 (Ala. 2013), this Court clarified and restated the sixth exception to § 14 immunity set forth in Drummond Co. v. Alabama Department of Transportation, 937 So. 2d 56, 58 (Ala. 2006), by holding that the exception applies only to the following:

"'"(6)(a) actions for injunction brought against State officials in their representative capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their

authority, or in a mistaken interpretation of law, <u>Wallace v. Board of Education of Montgomery County</u>, 280 Ala. 635, 197 So. 2d 428 (1967), and (b) actions for damages brought against State officials in their individual capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, subject to the limitation that the action not be, in effect, one against the State. <u>Phillips v. Thomas</u>, 555 So. 2d 81, 83 (Ala. 1989)."

"'116 So. 3d at 1141.'

"<u>Ex parte Wilcox Cnty. Bd. of Educ.</u>, 279 So. 3d [1135,] 1140-42 [(Ala. 2018)]."

<u>Ex parte Alabama Dep't of Youth Servs.</u>, 401 So. 3d 276, 283 (Ala. 2024).

"Auburn University is a public university and 'an instrumentality of the state.' <u>Rigby v. Auburn Univ.</u>, 448 So. 2d 345, 347 (Ala. 1984). The Auburn University Board of Trustees has been organized to carry out the educational mission of the university. See Ala. Const. 1901 (Off. Recomp.), Art. XIV, § 266. Among other things, the board of trustees has been empowered 'to organize [Auburn University] by appointing a corps of instructors, who shall be styled the faculty of the university and such other instructors and officers as the interest of the university may require; ... to prescribe courses of instruction ...; ... and to do whatever else it may deem best for promoting the interest of the university.' § 16-48-4, Ala. Code 1975."

57

Burton v. Hawkins, 364 So. 3d 962, 971 (Ala. 2022). Additionally, this Court has held that "actions against officers, trustees, and employees of state universities in their official capacities are likewise barred by § 14." Alabama Agric. & Mech. Univ. v. Jones, 895 So. 2d 867, 873 (Ala. 2004).

A. Claims for Injunctive Relief Against the Defendants in their Official Capacities

The defendants assert:

"Northcutt seeks contract-based damages, specific performance of the supposed Student-University contract in the form of being awarded her degree, injunctive relief relating to the contract, attorney's fees, and other relief …. All the requested relief (besides that seeking prospective relief), would affect either Auburn's 'contract rights,' the state treasury, or both, and thus this claim is, in effect, a claim against Auburn barred by state immunity."

Petition, pp. 32-33 (emphasis added).[5] As we noted in part I.A., the only specific equitable relief requested by the Northcutts in the third amended complaint was prospective injunctive relief. Because it does not appear that the Northcutts requested any retrospective injunctive relief, we need

---

[5]The defendants also assert that any claim for specific performance would be barred because it would affect a contract right of the State. However, the Northcutts did not specifically request specific performance of either the settlement agreements or the student/university contract. Rather, they merely sought prospective injunctive relief.

58

not determine whether the defendants would be entitled to State immunity as to any such claim.[6]

However, the Northcutts have also requested attorneys' fees in connection with their state-law claims for injunctive relief. In Ex parte Town of Lowndesboro, 950 So. 2d 1203 (Ala. 2006), the Town of Lowndesboro and Lee Frazer commenced a declaratory-judgment action against the Alabama Department of Environmental Management ("ADEM"). The circuit court entered a summary judgment in favor of the Town of Lowndesboro and Frazer. It also awarded them interim attorneys' fees and expenses. ADEM appealed the circuit court's

---

[6]In their reply brief, defendants assert:

"There should be no tortious interference claims, even for injunctive relief, against the official capacity Board Defendants. See Ex parte Pinkard, 373 So. 3d [192,] 199 [(Ala. 2022)]. Any injunctive relief against the Board Defendants should be considered on the breach of contract claims themselves, not on secondary claims of tortious interference, which should simply be dismissed in their entirety."

Reply brief, p. 19. However, the defendants raised this argument for first time in their reply brief. "[A]rguments made for the first time in a reply brief are 'waived, and will not be considered by this Court.' Perkins v. Dean, 570 So. 2d 1217, 1220 (Ala. 1990)." Wiggins v. Mobile Greyhound Park, LLP, 294 So. 3d 709, 729 (Ala. 2019).

judgment. The Court of Civil Appeals reversed the circuit court's judgment and held that the award of attorneys' fees and expenses against ADEM violated § 14. The Town of Lowndesboro and Frazer filed a petition for a writ of certiorari in this Court, and this Court granted the petition. This Court ultimately held:

> "Although the petitioners' underlying declaratory-judgment action may not have been barred by § 14, it is clear that an award of interim attorney fees and expenses impacts the State treasury and divests it of funds in the very way forbidden by § 14. Haley v. Barbour County, 885 So. 2d 783, 789 (Ala. 2004). Therefore, the Court of Civil Appeals correctly held that the award of interim attorney fees was barred."

Ex parte Town of Lowndesboro, 950 So. 2d at 1211-12 (footnote omitted).

In this case, the Northcutts stated their claims for injunctive relief against the defendants in their official capacities. State immunity

> "'means not only that the state itself may not be sued, but that this cannot be indirectly accomplished by suing its officers or agents in their official capacity, when a result favorable to plaintiff would be directly to affect the financial status of the state treasury.' State Docks Comm'n v. Barnes, 225 Ala. 403, 405, 143 So. 581, 582 (1932) (emphasis added); see also Southall v. Stricos Corp., 275 Ala. 156, 153 So. 2d 234 (1963)."

Patterson v. Gladwin Corp., 835 So. 2d 137, 142 (Ala. 2002). Therefore, State immunity would bar the award of attorneys' fees related to the

Northcutts' request for prospective injunctive relief arising out of the Northcutts' state-law claims, and the defendants are entitled to a dismissal of the request for attorneys' fees.

### B. Claims for Monetary Damages Against the Employee Defendants in their Individual Capacities

"Unlike an official-capacity claim, an individual-capacity claim seeks to hold a government official or employee personally liable, and to the extent that it seeks monetary recovery, it demands it from the individual himself rather than from a 'governmental entity' or the State treasury. [Suttles v. Roy, 75 So. 3d 90, 98 (Ala. 2010)]. Because genuine individual-capacity claims run against officers personally, not against the State, we have traditionally held that such claims cannot trigger § 14's jurisdictional bar. See [Ex parte] Sawyer, 984 So. 2d [1100,] 1108 [(Ala. 2007)].

"It sometimes happens, however, that a plaintiff will label a claim an 'individual capacity' claim even though the substance of that claim makes clear that the State is, in reality, the adverse party. In such a circumstance, this Court has long held that substance trumps form: the so-called individual-capacity claim is functionally a claim against the State and therefore barred by § 14. See Glass v. Prudential Ins. Co. of Am., 246 Ala. 579, 586, 22 So. 2d 13, 19 (1945).

"… [I]f a claim against an officer seeks relief that would 'directly affect a contract or property right of the State' -- such as by demanding money from the State treasury, requesting specific performance of the State's contractual obligations, or asking the court to quiet title to State lands -- the claim is against the State and barred by § 14. Mitchell v. Davis, 598 So. 2d 801, 806 (Ala. 1992)."

Ex parte Pinkard, 373 So. 3d at 199.

## 1. Breach-of-Contract Claims

The employee defendants argue that the Northcutts' breach-of-contract claims against them in their individual capacities are due to be dismissed. With regard to Count 5, which alleges breach of the settlement agreements, the employee defendants contend that "none of them is, or ever was, a party to any settlement agreement with Northcutt" and that they "cannot be liable in damages for breaching a contract to which they are not a party. See Childs v. Pommer, 348 So. 3d 379, 387-88 (Ala. 2021); Ohio Valley Conf. [ v. Jones, 385 So. 3d 948 (Ala. 2023)]." Petition, p. 31 (emphasis in original). With regard to Count 7, which alleges a breach of the student/university contract, the employee defendants contend:

> "If any 'Student-University' contract such as the one described by Northcutt existed, it was by definition between Northcutt and Auburn. None of the Employee Defendants named in this breach of contract claim was a party to any such contract, and thus cannot be individually liable in damages for any breach. See Childs, 348 So. 3d at 387-88; Ohio Valley Conf., [supra]."

Petition, p. 32. However, these arguments go to the underlying merits of the Northcutts' breach-of-contract claims, not the issue of State immunity.

62

> "At the outset, we note that, although the parties discuss the cognizability under Alabama law of the plaintiffs' bad-faith claim in light of this Court's decision in <u>City of Montgomery v. Collins</u>, 355 So. 2d 1111 (Ala. 1978), we do not address that issue. '"Subject to certain narrow exceptions, we have held that, because an 'adequate remedy' exists by way of an appeal, the denial of a motion to dismiss or a motion for a summary judgment is not reviewable by petition for writ of mandamus."' <u>Ex parte Kohlberg Kravis Roberts & Co.</u>, 78 So. 3d 959, 966 (Ala. 2011) (quoting <u>Ex parte Liberty Nat'l Life Ins. Co.</u>, 825 So. 2d 758, 761-62 (Ala. 2002)). One of the few 'narrow exceptions' we have recognized to the aforesaid general rule is a petition for a writ of mandamus complaining of the denial of a motion to dismiss grounded on a claim of immunity. <u>Ex parte Dickson</u>, 46 So. 3d 468, 471 (Ala. 2010) (citing <u>Ex parte Simpson</u>, 36 So. 3d 15, 22 (Ala. 2009)). Accordingly, we limit our review of the claim of bad-faith failure to pay legal fees and expenses to an examination of whether the City is immune from such a suit, leaving aside any questions as to the legal or factual merits of that claim."

<u>Ex parte City of Bessemer</u>, 142 So. 3d 543, 549 (Ala. 2013). Because the employee defendants' argument that they are entitled to a dismissal of the breach-of-contract claims on this ground go to the underlying merits of those claims, we will not address that argument.

### 2. Tortious-Interference-with-Contractual-Relations Claims

The employee defendants argue that the Northcutts' intentional-interference-with-contractual-relations claims against them in their individual capacities are due to be dismissed. With regard to Count 6,

63

which alleges interference with the settlement agreements, the employee defendants assert:

"As discussed above in response to Count 5 (Breach of Contract), Auburn's sovereign immunity includes the Board of Trustees, meaning that it and they can never be sued directly or indirectly. This immunity may not be waived, and the trial court lacked subject matter jurisdiction to entertain a claim for monetary damages against Auburn or the Board Defendants. See Patterson v. Gladwin Corp., 835 So. 2d 137, 142 (Ala. 2002). This means that the settlement agreement is not enforceable against Auburn to the extent it seeks monetary relief, nor can it be enforced indirectly through a suit against the Board Defendants (or Employee Defendants) because, as discussed above, the relief sought by Northcutt would affect the State's contract rights and treasury.

"Under Alabama law, there can be no tortious interference with a contract that is not enforceable. White Sands Group, L.L.C. v. PRS II, L.L.C., 998 So. 2d 1042, 1054 (Ala. 2008). ('A claim of tortious interference with a contractual relationship presupposes the existence of an enforceable contract.'). Northcutt's tortious interference claim based on the settlement agreement with Auburn, to the extent it seeks monetary damages, fails as a matter of law because at least as to money damages, the contract is unenforceable due to Auburn's immunity. See Johnson v. Sorensen, 914 So. 2d 830 (Ala. 2005) (discussing unenforceable contract with public university based on immunity).

"Count 8 is another claim for intentional interference with a contractual relationship, this one based upon the supposed 'Student-University' contract between Northcutt and Auburn that Northcutt claims in Count 7 to have been breached. (Appx. E, at ¶ 281). Northcutt sues Employee Defendants Gogue, Lee, Kerpelman, Rahman, Flowers,

64

> O'Neill, and Hammer. <u>See</u> <u>ibid.</u>, at 57-58, ₱ 283. For the same reasons discussed above regarding the other tortious interference claim (Count 6), the tortious interference claim based on the student-university contract, such that it seeks monetary damages or retrospective relief, is also due to be dismissed."

Petition, pp. 34-35. However, the employee defendants' argument in this regard does not go to the issue whether <u>they</u> are entitled to State immunity as to the tortious-interference claims against them. Rather, it goes to the underlying merits of the tortious-interference claims. Thus, we will not address the employee defendants' argument that they are entitled to a dismissal of the tortious-interference claims on this ground. <u>See</u> <u>Ex parte City of Bessemer</u>, supra.

Conclusion

Based on the foregoing, we grant the petition in part and direct the trial court to dismiss the Northcutts' claims for monetary damages against the employee defendants in Counts 3 and 4 of the third amended complaint on the ground of federal qualified immunity. We also direct the trial court to dismiss the Northcutts' request for attorneys' fees arising out of their request for prospective injunctive relief as to the state-law claims on the ground of State immunity.

65

However, the defendants have not demonstrated that they have a clear legal right to the dismissal of the Northcutts' request for attorneys' fees arising out of their request for prospective injunctive relief as to the federal-law claims. Additionally, the employee defendants have not established that they have a clear legal right to the dismissal of the Northcutts' request for monetary damages as to the state-law claims asserted in Counts 5, 6, 7, and 8 on the ground of State immunity. Accordingly, we deny the petition as to those claims.

PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.

Shaw, Bryan, and McCool, JJ., concur.

Stewart, C.J., and Sellers and Mendheim, JJ., concur in the result.

Cook and Lewis, JJ., recuse themselves.